The State v. Duncan.

THE STATE v. W. M. DUNCAN et al.

BROKER. *Definition of.* A broker, within the meaning of our revenue laws, is an agent who negotiates sales between parties for a commission, and therefore a person who sells only stocks and bonds bought by him is not a broker.

FROM DAVIDSON.

Appeal from the Chancery Court at Nashville. A. G. MERRITT, Ch.

ATTORNEY-GENERAL LEA, CHAMPION & HEAD and DODD & TAYLOR for complainant.

COLYAR, MARKS & CHILDRESS and JOHN RUHM for defendants.

COOPER, J., delivered the opinion of the court.

As this case now stands before us it is a bill by the State, filed January 21, 1884, against the members of the firm of Newell, Duncan & Co., to charge them with a privilege tax to the State for several years, and the penalty for not promptly paying the same, for carrying on in the firm-name the business of a broker. The defendants in their answer denied that the firm was ever, during its continuance, engaged in the character of business designated by the name of the business of a broker, within the meaning of the revenue laws of the State. The chancellor, upon final hearing, gave a decree against the defendants for the

privilege taxes of certain years, without interest, and without any penalty.  Both parties appealed.

To show the character of the business carried on by Newell, Duncan & Co., the complainant has only taken the deposition of the defendant, W. M. Duncan. He testifies that the firm commenced business in 1875, and dissolved about the middle of 1881; that from 1875 to 1878 the firm was engaged in buying and selling coal, in buying and selling real estate, and also bought and sold local securities on their own account, though not as a business.  From July, 1879, to July, 1881, the firm bought and sold stocks and bonds through their bankers and brokers in New York city.  The most of this business, says the witness, was done on our own account in speculation, but some of it was done for third parties. "When we did take orders from others we required them to pay ten per cent. of the face value or cost of the securities bought, and we then charged them interest on the balance due until the matter would be finally closed by selling the securities, or by the parties paying the balance and taking the securities."  On cross-examination, the witness says: "Every thing was purchased in New York in our own name, and for our own account; we charged one-quarter per cent. profit on transactions, and also made profits out of extra interest," that is, as elsewhere explained, the difference between the interest here and the lower rate the firm paid for money in New York. "We paid," adds the witness, "one-eighth per cent. to brokers in New York, then our net profit was one-eighth per cent. on transactions, besides the difference

in interest charged.    We assumed all responsibility in every case.    We made no transactions whatever as agent, and had our customers failed, we alone would have been liable to the New York broker, and in no case did the customer assume any responsibility to any one but our firm.    We in no case, he repeats, acted as agent or middle-man."

The substance of the testimony is that the firm of Newell, Duncan & Co. did sometimes, during the period mentioned by the witness, buy stocks and bonds in the New York market for third persons, making the purchases in every instance in the name of the firm, requiring the third party to advance ten per cent. of the cost price of the securities purchased, and charging him interest on the balance, and one-quarter per cent. commissions, which commissions were equally divided between the firm and the New York broker. And the question is, whether the business thus conducted made the firm a "broker" within the revenue law?

The act of 1865, chapter 8, fixed a privilege tax of $1,000 on "the regular or general business of broker."    There was a separate privilege tax on real estate brokers.    By the act of 1881, chapter 149, the privilege tax was raised to $1,500 on brokers.    By the same act a privilege tax was laid on real estate brokers, on brokers for commission or merchandise, on "dealers in sureties other than brokers," and on "dealers in stocks and bonds other than brokers."    These several privileges are retained by the act of 1883, chapter 106, which reduces the tax on brokers to

$200, and which adds to the privilege list "dealers in futures." It will thus be seen that the Legislature, while continuing to tax as a privilege "the regular or general business of broker," has recognized the limited nature of the business by gradually adding to the privileges the business of other brokers and dealers, fixing a separate rate of tax on each. "Ordinarily," says the Supreme Court of the United States, "the term broker is applied to one acting for others": *Warren* v. *Shook*, 91 U. S., 704. And it has been held by that court that a bank selling Federal securities only for the United States or themselves are not "brokers or bankers doing business as brokers" within the act of Congress charging them with a privilege tax. "A broker," this court has said, "is an agent who is employed to negotiate sales between the parties for a compensation in the form of a commission, which is commonly called brokerage. In the proper exercise of his functions, he does not act in his own name, but only as a middle-man": *Spears* v. *Loague*, 6 Cold., 420. The Code of 1858, section 550, enumerated among the taxable privileges "the regular or general business of broker," meaning the business of a broker in its ordinary and usual sense, that is to say, a broker acting for others as a middle-man, buying and selling on commission, without having any interest in the property, the subject-matter of trade. This character of business has continued to be taxed in the same sense down to the present time, the Legislature gradually turning into taxable privileges several kinds of business of a cognate character. The bill before

us only seeks to hold the defendants liable for the privilege tax upon the occupation of a broker, specifically mentioning the tax, and the acts fixing the charge. The only testimony taken does not establish the fact that the business carried on by the defendants through their firm was that of a broker in the ordinary meaning of the word as above explained. On the contrary, the testimony shows that the defendants never in any case acted as agent or middle-man. They bought the securities themselves in every instance, and the third person dealt exclusively with them. We can only look to the proof adduced.

The decree of the chancellor must be reversed, and the bill dismissed with costs.